**VILLAS OF LAKE JACKSON, LTD., et al., Plaintiffs,**

v.

**LEON COUNTY, et al., Defendants.**

**No. TCA 89–40247–WCS.**

United States District Court, N.D. Florida, Tallahassee Division.

Nov. 20, 1995.

See also 796 F.Supp. 1477.

E.C. Deeno Kitchen, Kitchen, Judkins, Simpson & High, Tallahassee, FL, for plaintiffs.

John C. Cooper, Cooper, Coppins & Monroe, Gregory T. Stewart, Gregory T. Stewart P.A., Tallahassee, FL, for defendant.

## ORDER ON REHEARING

SHERRILL, United States Magistrate Judge.

Plaintiffs moved for rehearing as to the order granting summary judgment in favor of Defendant. Docs. 395–397. Defendant responded, doc. 402, and Plaintiffs replied, docs. 405 and 407. Rehearing was granted, and oral argument was held as to the question of collateral estoppel. Docs. 410, 412, 413. The parties were asked to file supplemental materials concerning the issue of collateral estoppel, and have done so. Docs. 414–417.

## I. The legal basis for rehearing

■ The order which granted summary judgment, doc. 392, is an interlocutory order and may be reconsidered upon motion or *sua sponte*. Fed.R.Civ.P. 54(b); *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800, 805–806 and n. 4 (11th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994); *Melancon v. Texaco*, 659 F.2d 551, 553 (5th Cir. Unit A 1981). Plaintiffs' motion seeks reconsideration as to two issues: the effect of the 1972 letter to Dr. Bennison (the Bennison letter) as to the question of equitable estoppel, and collateral estoppel arising from the First District Court of Appeal decision.

■ The court has reconsidered these issues, but has also revisited the due process "takings" claim. It does so because the correct articulation of the claim available under that theory necessarily informs the court as to whether the claim is "ripe" for decision. Ripeness goes to this court's subject matter jurisdiction, a question which the court must consider *sua sponte*. *Reahard v. Lee County*, 30 F.3d 1412, 1418 (11th Cir.1994);

*Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n. 7 (11th Cir.1989).

## II. The due process takings claim, Count III

A due process claim as alleged in Counts II and III is that Plaintiffs were "deprived" of their "property" without due process. Count II was the "arbitrary and capricious substantive due process" claim, and Count III is the "due process takings claim."

In denying the County's motion to dismiss the fourth amended complaint, the court found that a due process takings claim may be lodged for the denial of a building permit if the property owner has a right by the Florida law of equitable estoppel law to the issuance of the permit.[1] That ruling depended upon *Eide v. Sarasota County*, 908 F.2d 716, 725 n. 16 (11th Cir.1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991): *Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir., Unit B, 1981), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982), and *A.A. Profiles, Inc. v. City of Ft. Lauderdale*, 850 F.2d 1483 (11th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989). Upon reconsideration it is apparent that the court erred in so holding, and has misconstrued those cases.

### A. A due process takings claim is not a procedural due process claim, and is not a separate kind of substantive due process claim

■ *Eide* held that the plaintiff there, who complained of a refusal to grant a rezoning, conceivably had four distinct claims that he could make. The due process takings claim was one. For the proposition that this claim exists, *Eide* cited *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) as "recognizing such a due process claim, but holding the claim to be premature." 908 F.2d at 721.

In *Williamson County*, the Court discussed a "due process taking" *theory* that had been argued by the petitioner. 473 U.S.

---

1. All other versions of this claim were dismissed.

at 197–199, 105 S.Ct. at 3122–3123. The Court referred to the due process takings claim as a "notion" or "theory" throughout the discussion, and at one point said: "[t]he due process argument finds support, *we are told* . . . ." *Id.*, emphasis added. The Court then said that it did not have to pass upon the merits of the argument that such a claim exists, finding instead that such a claim was premature. 473 U.S. at 199, 105 S.Ct. at 3123. Thus, *Williamson County* itself is an uncertain precedent for the proposition that a taking without compensation will give rise to a due process claim.[2]

*Williamson County* did, however, discuss at some length the theory of a due process takings claim, noting that a regulation which goes "too far" so as to destroy a property right without resorting to the procedures for eminent domain (and just compensation) would be an invalid exercise of the police power, the remedy for which would be invalidation of the regulation and, "if authorized and appropriate, damages." 473 U.S. at 197, 105 S.Ct. at 3122. However, since both *Williamson County* and *Eide* were decided, the Supreme Court decided *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). *Lucas* involved a conventional Fifth Amendment just compensation takings claim. *Lucas* held that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is to leave his property economically idle, he has suffered a taking [pursuant to the Fifth Amendment]." 505 U.S. at 1019, 112 S.Ct. at 2895. The Court determined that compensation is the appropriate remedy in this circumstance. *Id.* 505 U.S. at 1030, 112 S.Ct. at 2901. The Court pointed out that the state may elect to rescind its regulation, but still must provide compensation for the period of temporary taking, citing *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 321, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987). *Id.* 505 U.S. at 1030 n. 17, 112 S.Ct. at 2901 n. 17.

The direct *Lucas* holding is that regulation under the police power can, under certain circumstances, be "confiscatory" of property, and, as a consequence, just compensation may be required under the Fifth Amendment. But implicit in *Lucas* is the proposition that the regulation may well have been a valid exercise of the police power for the common good. Further, *Lucas* "acknowledge[d] explicitly" that through the "full scope of the State's police power" the government may, "consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate . . . ." *Id.* 505 U.S. at 1023, 112 S.Ct. at 2897. Indeed, the Court found a government may avoid the requirement of compensation, even for a regulation that denies all economically viable use of property, if background principles of nuisance and property law prohibited those uses in the first place. *Id.* 505 U.S. at 1026–27, 112 S.Ct. at 2899.

It would appear, therefore, that *Lucas* makes academic any distinction between a Fifth Amendment takings claim and a Fourteenth Amendment due process takings claim. As will be discussed ahead, if the premise of a due process takings claim is that a regulation becomes "invalid" if it "goes too far," that is, if property has been destroyed *without compensation, First English* and *Lucas* vitiate an essential element of that premise. Compensation must be paid. The State may elect also to rescind the regulation, thus reducing the interim payment due, but it need not if full compensation is forthcoming.

The due process takings claim has been seen heretofore in this circuit as distinct from an "arbitrary and capricious" substantive due process claim, which *Eide* found to be simply a substantive due process claim. *Eide,* 908 F.2d at 722 and n. 9. *See also Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1540 n. 11 (11th Cir.1991). But there are only two components of due process, substantive and procedural. *McKinney v. Pate,* 20 F.3d 1550, 1555 (11th Cir.1994)

---

**2.** *See Long Island Lighting Company v. Cuomo,* 666 F.Supp. 370, 397 (N.D.N.Y.1987), *appeal dismissed and judgment partially vacated after settlement,* 888 F.2d 230 (2d Cir.1989) (citing *William-son,* 473 U.S. at 196–200, 105 S.Ct. at 3122–24) (the due process theory has not been embraced or rejected by the Supreme Court).

(*en banc*), *cert. denied*, —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). A due process takings claim has to be either one or the other.

■■■ If a due process takings claim as it arises in this case [3] is premised upon substantive due process, then it really cannot be distinct from an "arbitrary and capricious" substantive due process claim. For a substantive due process claim is actionable only if the County acted irrationally.[4] "Substantive due process claims [challenging legislative acts] not involving a fundamental right are reviewed under the rational basis test." *TRM, Inc. v. United States*, 52 F.3d 941, 945 (11th Cir.1995).[5] A due process takings claim, on the other hand, seems to be actionable simply by the fact that the regulation went "too far" and "destroyed" (in due process terms, "deprived" the owner of) a property right. *If* this claim is based upon notions of substantive due process, the missing element, the irrationality of the regulation, could only be supplied by the fact that compensation for the property deprived was either denied or unavailable. But that dilemma, if it ever existed, has been cured by *First English, Lucas,* and *Joint Ventures, Inc. v. Department of Transportation*, 563 So.2d 622 (Fla.1990). In the latter case, Florida recognized an inverse condemnation remedy based upon zoning classifications for the first time. *Reahard v. Lee County*, 30 F.3d at 1417.

The only remaining alternative then, is that a due process takings claim is premised upon denial of adequate procedures for the deprivation of property, that is, the failure of the County to use the procedures established for eminent domain. But this is even less plausible since "the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings [eminent domain]." *First English*, 482 U.S. at 316, 107 S.Ct. at 2386. In *Williamson County,* the Court acknowledged that, in terms of the procedures required to effect a "just compensation clause" taking, a state is required only to provide a reasonable, certain and adequate provision for obtaining compensation after the taking has occurred. *Williamson County*, 473 U.S. at 193, 105 S.Ct. at 3120. As long as adequate post-deprivation procedures are available, and they are in Florida, there is no deprivation of any procedural right. *Id.; McKinney v. Pate*, 20 F.3d at 1563.

The practical consequence of this court's previous ruling that a due process takings claim may be lodged for the revocation of, or refusal to issue, a building permit where the property owner has a property right (by the Florida law of equitable estoppel) to a permit is that such a claim is actionable immediately, when the permit is denied, without proof that the government's action was irrational,[6] and without proof that state court remedies are inadequate to afford procedural due process.[7] The illogic of this is two-fold. The first is a consequence of what has been discussed above: the claim becomes actionable as a federal question even though the state land regulatory authority may have had a

---

3. As will be discussed ahead, the court has now determined that the County's actions were legislative, and that the analysis of *McKinney v. Pate* does not apply. The court agrees with *Sullivan Properties, Inc. v. City of Winter Springs*, 899 F.Supp. 587 (M.D.Fla.1995), but finds that case arises on different facts.

4. Although courts often discuss this in conjunction with just compensation claims, when an actual finding is made that the regulatory measure has not been implemented for a rational, legitimate purpose, such finding leads to the invalidation of the regulation. *E.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *Nectow v. City of Cambridge*, 277 U.S. 183, 186, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928); *Greenbriar v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir.

1989). Yet a true just compensation claim, one which seeks compensation, admits the validity of the regulation. *Lucas.*

5. The test is identical to that used for equal protection claims. *Id.; Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214, n. 6 (11th Cir. 1995). "[T]he legislation must be sustained if there is any conceivable basis for the legislature to believe that the means they have selected will tend to accomplish the desired end." *Id.*, quoting *Cash Inn of Dade, Inc. v. Metropolitan Dade County*, 938 F.2d 1239, 1241 (11th Cir.1991).

6. If the claim is based upon substantive due process.

7. If the claim is based upon procedural due process.

rational basis for its action,[8] and even though there is an adequate state remedy in inverse condemnation. This is fundamentally contrary to due process principles. Due process provides a remedy only if the property was deprived *without* due process.[9] Due process does not categorically forbid the deprivation of property.

Second, such a claim becomes actionable at the moment that the permit is denied or revoked. Debate as to the "ripeness" of the claim (whether a complete "taking" has occurred) is mooted if the "property" for this subspecies of a "taking" claim has been narrowed in definition to the permit itself. As a consequence, the state law equitable estoppel claim would become immediately actionable in federal court under the guise of a due process claim.

In short, if the result of attempting to cross a Fifth Amendment just compensation claim with a due process claim is some sort of due process claim, as was found in *Eide*, the "taking" gene of the hybrid fails. A due process takings claim has no justification independent of normal due process principles. The better approach would be to find, and the court so rules, that a due process takings claim is a substantive due process claim. Count III, therefore, is nothing more than Count II restated. Thus, the court's ruling upon summary judgment as to Count II applies with equal force to Count III.

**B. Alternatively, if a due process takings claim has independent existence and is governed by "takings" law, the "property" which is the subject of deprivation must be the same as for a Fifth Amendment just compensations claim: the bundle of rights are inseparable.**

 Defendants previously argued that only the deprivation of all or substantially all

economic value of the entire property, considered as a whole, constitutes a taking under "due process taking" theory. Doc. 212. The court earlier rejected this argument. Upon reconsideration, that determination was error.

 For a Fifth Amendment just compensation, it is well-settled that while "property" may exist as a bundle of separate property interests, the entire bundle must be considered the "property" when determining whether the "property" has been "taken." *E.g., Lucas,* 505 U.S. at 1026–27, 112 S.Ct. at 2899; *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, ——, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993); *Keystone Bituminous Coal Association v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Loretto v. Teleprompter Manhattan CATV Corporation,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Dolan v. City of Tigard,* —— U.S. ——, ——, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994). The bundle of "[p]roperty rights in a physical thing have been described as the rights to 'possess, use and dispose of it.' " *Loretto,* 458 U.S. at 435, 102 S.Ct. at 3176. The right to develop land in a particular way, i.e. the right to "use" it, falls within the bundle of rights associated with the ownership of real property. Although various aspects associated with the ownership of real property may be severable, and under state law may be "property" in and of themselves, they cannot be segregated from the bundle for the purposes of takings analysis. *E.g., Keystone,* 480 U.S. at 498–502, 107 S.Ct. at 1249–50 (although state property law may recognize a support estate as a separate interest in land, such legalistic distinctions

---

**8.** If the claim lacked a rational basis and the property owner wishes to obtain a ruling that the regulation is invalid, he has an adequate remedy by means of a normal substantive due process claim, which *Eide* has termed an "arbitrary and capricious" substantive due process claim. *Eide* noted that the remedy for this claim is really identical to the remedy for the theoretical due process takings claim discussed by *Williamson County,* an injunction striking the regulation (for a facial challenge) or against application of the regulation to the property (for an "as applied"

challenge) and damages. 908 F.2d at 722; *Williamson County,* 473 U.S. at 197, 105 S.Ct. at 3122.

**9.** As discussed above, for a substantive claim, the "without" due process element is proof of a lack of a rational basis for the action, and for a procedural claim, it is the denial of procedures for adequate compensation for the property so deprived.

within the bundle of property rights is not recognized in takings jurisprudence); *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 at 130, 98 S.Ct. 2646 at 2662, 57 L.Ed.2d 631 (1978). In determining whether a taking has occurred, the focus is placed on the character of the action, and the nature of the interference with the rights in the parcel as a whole. *Keystone*, 480 U.S. at 497, 107 S.Ct. at 1248. Examples of this are evident throughout the Supreme Court's analysis of takings claims. *E.g., Concrete Pipe*, 508 U.S. at ——, 113 S.Ct. at 2290 (and cases cited) (takings claim cannot be divided into what has been taken and what was left for purpose of demonstrating that the taking of the former was complete).

■ In contrast, the "property" which is protected by due process is not just the property considered as a whole, but any subsidiary "property right." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Thus, due process does provide protections when subsidiary strands of the property rights bundle are deprived by state action. This, however, does not end the analysis.

■ *Eide* stated that "[f]or a due process takings claim to be ripe, courts apply the same final decision requirement as in the just compensation claim context." 908 F.2d at 721. *Eide* explained: "[T]he reason for this requirement in the due process takings claim context is that a court cannot determine whether a regulation has gone too far unless the court knows how far the regulation goes." *Id.* The final decision requirement mandates that a landowner obtain a final decision regarding the application of the regulation to his or her property, and must seek variances from the applicable regulations if provisions to do so exist. *Id.*

Since *Eide* held that the finality requirement is functionally the same for a Fifth Amendment just compensation claim and a due process takings claim, *Eide* must have deemed the two claims to be functionally identical. *Eide*, therefore, must have envisioned a due process takings claim to be concerned only with a taking of all of the bundle of property rights, and not just a strand.

The alternative is inconsistent with *Eide*'s careful discussion of ripeness. A regulation which forbids a particular use of the land, or, as in the case at bar, which prohibits an RM-3 development, becomes, *ipso facto*, a final decision that has gone too far because the particular use—the particular strand of the bundle of property rights—has indeed been voided entirely. This would happen in every instance. As is usual in a due process claim, the claimant would identify the property right which was deprived. The property owner would simply claim the taking of the use which he or she wished to make of the property. *If* the imposition of a limitation upon a particular use of the land is all that is needed to generate a due process takings claim, then ripeness would be irrelevant for most due process takings claims.[10]

Thus, the more tenable view of a due process takings claim, if such a claim exists and if it must be "ripe" in the same manner as a just compensation claim, is that it involves exactly the same sort of "taking" as a just compensation takings claim. A right under state law to develop in a particular way, or a permit previously issued for development, are factors to be considered in determining expectation-backed interests for the determination of the extent of loss suffered as result of regulation. But the right to develop or use land in a specific manner cannot be separated from the land itself for the purpose of determining whether a regulation has "gone too far" such that taking has occurred. For that reason, even if Florida

---

10. Further, if each right to develop (whether vested by permit, equity, or inherent in the ownership of the land) is a distinct property interest protected by a due process takings claim, then compensation would be required in every instance where greater restrictions are imposed by changes in zoning or regulation, even if other uses for the affected land remain. This runs counter to fundamental notions of the relationship between the constraints of the federal constitution and the authority of local government to zone for the public good. As noted long ago by the Court in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."

law recognizes a property interest in a building permit derived through the doctrine of equitable estoppel, that interest is not a form of property that is to be considered separate from the land itself for due process takings analysis.

This court was previously troubled by what appeared to be contrary holdings in *Wheeler v. City of Pleasant Grove,* 664 F.2d 99 (5th Cir., Unit B, 1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982), and *A.A. Profiles, Inc. v. City of Ft. Lauderdale,* 850 F.2d 1483 (11th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989). A more careful reading of *Wheeler,* particularly in light of the discussion above, reveals that *Wheeler* involved only a substantive due process claim. Throughout the opinion the court's focus was upon whether the city ordinance in question[11] was "arbitrary or irrational." 664 F.2d at 100. The court held that the ordinance bore no substantial relationship to legitimate concerns for health, safety, welfare, or the well being of the community, and was therefore unconstitutional. *Id.* All of those factors, which ultimately led to the invalidation of the ordinance in *Wheeler,* are relevant considerations for a substantive due process claim.

In the order on Defendant's motion to dismiss, however, this court found that *Wheeler* held that since the ordinance had been found by the trial court to have been "confiscatory," it was a "taking." Doc. 198, p. 24. The passage which caused this finding is the following from *Wheeler:*

> This court perceives the enactment of Ordinance no. 216 to be a bald attempt to revoke an already authorized building permit. Findings by the trial court indicate that this action was a confiscatory measure. Under *Maher v. City of New Orleans,* 516 F.2d 1051, 1065, rehearing denied, 521 F.2d 815 (5th Cir.1975), cert. denied, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 [1976], if a regulatory under-

taking is confiscatory in nature, it is a taking.

664 F.2d at 100.

Two aspects of this passage cause this court now to believe that the *Wheeler* court relied more upon an arbitrary and capricious substantive due process claim rather than some sort of due process takings theory. The first, the finding that the ordinance was a "bald" attempt to revoke the permit, is consistent with a finding that the action was arbitrary and capricious.

As to the second, the court seemed to place reliance upon the trial court's finding that the ordinance was "confiscatory" and thus caused a "taking," citing *Maher v. City of New Orleans,* 516 F.2d 1051, 1065 (5th Cir.1975). But *Maher* did not involve revocation of a building permit previously granted. It simply involved a zoning regulation which limited the use of the property.

Maher owned a Victorian cottage in the French Quarter. He wanted to demolish the building and erect a seven story apartment complex. New Orleans had enacted a historic preservation ordinance which prohibited demolition of existing structures, and refused to issue a permit for demolition of the cottage. The court first held that the ordinance was proper exercise of police power. Then it turned to whether the ordinance constituted a "taking" notwithstanding its validity. As to the "taking" question the court held that "a regulatory ordinance may nonetheless be a taking if it is unduly onerous so as to be confiscatory." 516 F.2d at 1065. But a regulation becomes "unduly onerous" only to the extent that it is a taking when landowner is left with "in effect, nothing." *Id. Maher* noted that a taking does not occur when the regulation prevents the property from achieving its maximum economic potential, citing *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). Finding that Maher had failed to show that sale of the

---

**11.** In *Wheeler,* a land owner obtained a permit to build apartments. The land was zoned for apartments. The owner commenced construction, but after public outcry the city adopted an ordinance prohibiting the construction.

property was impracticable, that commercial rental could not provide a reasonable rate of return, or that other potential uses of the property were foreclosed, the court held that no taking had occurred. 516 F.2d at 1066.

*Maher,* therefore, is in the mainstream of takings jurisprudence. It is not a case from which one can derive the principle that a "taking" protected by due process may occur from the "bald attempt to revoke an already authorized permit," standing alone.

Two conclusions about *Wheeler* consistent with *Maher* can be drawn. *Wheeler* might have affirmed without discussion the trial court's finding that the action of the city revoking the permit was confiscatory because the trial court had found that the property owner had no other viable economic use for the property except the particular development for which the permit had issued. In that event, *Wheeler* would also rest upon a conventional takings claim, one which had fully considered all viable economic uses of the property. The second alternative is that *Wheeler* confused the difference between an arbitrary and capricious due process claim and a due process takings claim,[12] but rested its decision upon the former, finding the city's action to have been arbitrary and capricious. In either event, *Wheeler* does not clearly stand for the proposition that revocation of a building permit, standing alone, gives rise to a due process takings claim.

*A.A. Profiles* is the second case relied upon in the prior order. As to *A.A. Profiles,* the prior order found:

> *Wheeler* was the basis for the decision in *A.A. Profiles.* In *A.A. Profiles* the City of Ft. Lauderdale approved by ordinance a wood chipping industrial operation on plaintiff's land. This activity was also consistent with existing zoning. When the city discovered violations of the permit as issued, it suspended the approval provided by the ordinance and subsequently made the permit a nullity by rezoning the land. As to the taking issue, the court first found the case indistinguishable from *Wheeler.* It then held:

The original resolution granted appellant a *property* interest. The rezoning ordinance denied appellant this *property* interest because the new classification did not accommodate a development like the woodchipping operation. The City Commission's action therefore was a confiscatory measure.... We note also that although the taking did not occur simply because appellant expended a great amount of money to begin the project, this expenditure in reliance on the resolution underscores the importance of the original resolution.

850 F.2d at 1488 (emphasis added).

In sum, *A.A. Profiles* does not discuss Florida law, but it clearly holds that a development permit duly issued by a Florida local government is a species of property for due process and taking clause purposes, especially if the property owner has taken actions in reliance upon the permit to his detriment. As a corollary, it held that when a state or local government precludes the use of such a development permit, it has taken property for which just compensation must be provided.

Doc. 198, pp. 26–27.

Upon reconsideration, the following is noted. The claims in *A.A. Profiles* were a just compensation takings claim and a procedural due process claim. 850 F.2d at 1483. Noticeably absent was any mention of a due process takings claim.

 Further, the court adjudicated only the Fifth Amendment just compensation takings claim. 850 F.2d at 1488 n. 9. Enroute, *A.A. Profiles* summarized conventional principles of law governing a Fifth Amendment just compensation takings claim, citing Fifth Amendment just compensation takings cases.[13] *Id.* But in that passage, *A.A. Profiles* contains a subtle but important misstatement of Fifth Amendment law. It held in part that a Fifth Amendment takings claim would lie if the regulation "deprive[s] an owner of *an* economically viable use of the land." 850 F.2d at 1486 (emphasis added).

---

**12.** "This court has itself confused due process takings and arbitrary and capricious due process claims." *Eide,* 908 F.2d at 722.

**13.** *E.g., Williamson County* and *Keystone.*

*Lucas* held that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is to leave his property economically idle, he has suffered a taking [pursuant to the Fifth Amendment]." 505 U.S. at 1019, 112 S.Ct. at 2895 (emphasis added). *Lucas* was restating well-established precedent. The question is not whether a single economic use of the land has been "taken," but whether the regulation has gone "too far," denying the owner of "all reasonable beneficial use of its property." *Williamson County,* 473 U.S. at 185–186, 105 S.Ct. at 3116, and cases cited beginning with *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

The erroneous articulation of the takings standard in *A.A. Profiles* was apparently compounded by the City's ripeness argument.[14] Instead of arguing that the property owner's claim was not ripe because he had not applied to the City for economic uses of the land other than a wood chipping operation, the City argued that "there was no final decision because the appellant never completed the wall that was a condition precedent to commencing business [as a wood chipping operation]." 850 F.2d at 1487. Construction of a ten foot wall around the entire site had been a condition for approval by the City of development of the land for a wood chipping facility. 850 F.2d at 1484–1485.

Having narrowed the court's focus to conditions precedent to development for a particular purpose, it is understandable that the court then confined its "ripeness" analysis to the question of whether there had been a final decision by the City as to development for that single purpose. The court logically observed that the City had temporarily suspended the wood chipping operation permits and then had rezoned, forbidding such use. 850 F.2d at 1487. The court concluded that the rezoning was the "final, definitive position" of the City. Of course that was true

with regard to a wood chipping plant, but not dispositive of the issue of ripeness for a Fifth Amendment takings claim as to the property, the claim before the court.

*A.A. Profiles* then turned to *Wheeler,* finding it "indistinguishable from this case." 850 F.2d at 1487. It held:

> The original resolution [approving development of a wood chipping operation] granted appellant a property interest. The rezoning ordinance denied appellant this property interest because the new classification did not accommodate a development like the wood-chipping operation. The City Commission's action therefore was a confiscatory measure. "[I]f a regulatory undertaking is confiscatory in nature, it is a taking." *Id.* at 100 [*Wheeler,* 664 F.2d at 100].

Like *Wheeler,* the result in *A.A. Profiles* is probably right for the same reason. Revocation of the prior duly obtained approval to develop a wood chipping operation was arbitrary and capricious, and not rationally related to any legitimate governmental interest. Indeed, *A.A. Profiles* referred in part to *Wheeler* as a case where the issuance of the new ordinance revoking the prior approvals had been "arbitrary and capricious." 850 F.2d at 1487. That sort of governmental misbehavior, however, is the basis for a substantive due process claim, not a Fifth Amendment takings claim.

▪ That *A.A. Profiles* was correctly decided as a substantive due process case is the only way it can be squared with both takings and substantive due process jurisprudence. In this way, another portion of that case, which was confirmed in *The Reserve, Ltd. v. Town of Longboat Key,* 17 F.3d 1374, 1379–1380 (11th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995), also makes sense: there *is* a property interest under Florida law to proceed with a specifically approved development after the expenditure of significant sums of money in reliance upon the approval. This property

---

**14.** *A.A. Profiles* was decided at a time when it was unclear whether an inverse condemnation suit would lie to provide just compensation for a regulatory taking by zoning or land use regulation. *A.A. Profiles* concluded that such just com-

pensation was not available under Florida law. 850 F.2d at 1486 n. 3. Thus, the only aspect of ripeness considered was the need to obtain a final decision from the regulatory authority.

interest is one which due process protects. It may be deprived, but only if the deprivation is rationally related to a legitimate governmental interest.[15] But that property right is only one strand of the bundle of property rights which must be considered for any sort of takings claim.

Finally, the reported cases decided by Florida district courts since this court ruled are consistent with the reasoning above. All have involved only the orthodox version of substantive due process, and have not considered or discussed a due process takings claim as previously thought to exist by this court. *Hy Kom Development Company v. Manatee County*, 837 F.Supp. 1182 (M.D.Fla.1993) is one. In that case the court relied upon the same cases as this court to conclude that Florida law does create a kind of property in the expectation of the issuance of a building permit that is protected by due process. *Hy Kom*, however, did not involve a due process takings claim, but a conventional substantive due process claim that the government's action had been arbitrary and capricious. 837 F.Supp. at 1184.[16] To like effect is *Decarion v. Monroe County*, 853 F.Supp. 1415 (S.D.Fla.1994). The claim there was a substantive due process claim based upon a theory that the County's revocation of a building permit denied due process because the decision was arbitrary and capricious.

In summary, this court erred in its finding that a due process takings claim may lie for the deprivation of a vested interest to develop land in a specific manner. Such a vested right is a property right protected from deprivation by substantive due process. But for any sort of takings claim, whether arising under the Fifth Amendment or the

Due Process Clause of the Fourteenth Amendment, it is only one strand of the many rights in the bundle which must be considered.

Thus, even if a due process takings claim exists as some sort of due process claim distinct from a substantive due process claim, it does not exist as articulated by Plaintiffs. A due process takings claim cannot be premised upon the County's act of rezoning to Estate zoning, thereby revoking RM–3 development rights. Defendant's motion to dismiss for failure to state a claim as to this aspect of Count III will be granted for this additional reason.

This dismissal leaves the court without jurisdiction of any aspect of Count III. The court has already dismissed Plaintiffs' claim that all viable economic uses of the underlying land were "taken" on ripeness grounds (for lack of a final decision by the County and for failure to pursue state court inverse condemnation remedies).

## III. Count V

Count V brings a state law inverse condemnation action. This court previously dismissed Count V to the extent that it sought damages for taking of all economic uses of the land, and abstained to the extent that it sought a state remedy for denial of permission to proceed under either the 1972 or 1989 RM–3 development plans. Doc. 226.

Federal law permits this court to decline to exercise supplemental jurisdiction over state law claims where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139,

15. *The Reserve, Ltd.* held:
> A substantive due process analysis, within the deprivation of a property interest context, involves two queries. *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir.1989). First, was the plaintiff deprived of a constitutionally protectible property interest? *Id.* Second, assuming a property interest, was the deprivation of that 'property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis[?]' *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir. 1982).

17 F.3d at 1379. *The Reserve* clarified Eleventh Circuit precedent which previously troubled this court, finding that the Florida cases giving rise to a claim of equitable estoppel against denial or revocation of a building permit create a species of property protectible from deprivation by substantive due process.

16. The County's actions were alleged to have been arbitrary and capricious, without any legitimate purpose connected with the health, safety, and welfare of its residents, but as part of a scheme maliciously to enable the County to acquire the property for a lower price.

16 L.Ed.2d 218 (1966). The court has "jurisdiction over a substantial federal claim ... deriv[ing] from a 'common nucleus of operative fact,'" *L.A. Draper and Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414, 427 (11th Cir.1984), relying on *Gibbs.*

■ Since the court has either dismissed or granted summary judgment in favor of Defendant as to all federal claims, "the decision whether or not to exercise pendent jurisdiction over state law claims is within its discretion." *Rice v. Branigar Organization, Inc.,* 922 F.2d 788, 792 (11th Cir.1991). Furthermore, "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state law claims." *L.A. Draper,* 735 F.2d at 428. The novelty of the state claim, which gives rise to issues of comity, and whether a state forum is available to adjudicate the Plaintiff's claim, are important considerations in the exercise of this discretion. *L.A. Draper,* 735 F.2d at 428; *Rice,* 922 F.2d at 792. The court's decision to dismiss or remand the pendent claim "is to be judged on an abuse of discretion standard." *Faucher v. Rodziewicz,* 891 F.2d 864, 872 (11th Cir.1990) (citing *L.A. Draper,* 735 F.2d at 420).

Plaintiffs have filed the same state inverse condemnation claim in state court, and that case has been stayed pending the outcome of this case. The state issues of law are both complex and novel. Accordingly, Count V will now be dismissed.

### IV. Collateral estoppel arising from *Equity Resources, Inc. v. County of Leon,* 643 So.2d 1112 (Fla. 1st DCA 1994) [17]

■ The existence of a property interest to proceed with an RM–3 development remains an essential element of Count II, the arbitrary and capricious due process claim. Thus, the court proceeds to rehearing of parts IV (collateral estoppel) and V (the facts underlying the property right claim).

■ Plaintiffs argue on rehearing that "the issue of Plaintiffs' good faith reliance on and acquisition of vested rights *in the 1972 RM–3 multifamily zoning* was not only litigated, it was the critical and central issue in the state court proceeding." Doc. 396, p. 16 (emphasis added). Plaintiffs further argue that the issue of vested rights in the 1972 RM–3 zoning was necessarily the central issue in the state court proceeding because all of the evidence presented during the state proceedings concerned actions taken in the furtherance of that proposed multi-family development, and all acts of reliance occurred before the 1989 down-zoning to Estate. They also argue that the land uses permitted under the 1989 Estate zoning and those permitted under the Comprehensive Plan are identical. They reason from this that it would have been useless and senseless for them to have sought estoppel against the County from complying with the Comprehensive Plan against Estate zoning because the uses under Estate zoning are identical to those permitted under the Comprehensive Plan. Supplemental briefing as to this last argument was ordered.

In the state litigation, although Plaintiffs tried to obtain a ruling that they had vested rights to proceed with an RM–3 development against the Comprehensive Plan,[18] the First District Court of Appeal explicitly held that adjudication of *that* claim could not occur. That court held that it had before it review of a petition for a vested rights determination governed by, and limited to, the procedures established by Ordinance 90–31. *Equity Resources, Inc. v. County of Leon,* 643 So.2d at 1114, n. 2. The rezoning to Estate occurred before the Comprehensive Plan took effect. *Id.* Therefore, the First District Court of Appeal held:

> By the county's act of rezoning, Phase II of the development was reclassified as "estate zoning" which corresponds to the current zoning applicable to Phase II under

---

17. Since the order on the motion for summary judgment was issued, the Florida Supreme Court has reaffirmed the Florida rule that mutuality of parties is required for the application of both defensive and offensive collateral estoppel. *Stogniew v. McQueen,* 656 So.2d 917 (Fla.1995).

18. Plaintiffs on rehearing have provided extensive evidence that this was their litigation strategy. They have also shown that they presented extensive evidence in support of this argument before every tribunal in the state proceedings.

the plan. *Since the rezoning occurred prior to the adoption of the comprehensive plan, the issues in the proceedings below were limited to a determination of Petitioners' vested rights to the commercial zoning of the undeveloped 7.5 acre tract and to the Estate District zoning of the remaining undeveloped 30 acres.*

*Id.* at 1114, n. 3 (emphasis added). The court further held that the 1989 down-zoning was the subject of litigation in this court, citing this case. *Id.*

In Florida "collateral estoppel requires 'that the issue in the second action that is sought to be estopped from relitigation *be identical to necessary and material issues* resolved in the first suit.'" *Florida Department of Transportation v. Gary,* 513 So.2d 1338, 1340 (Fla. 1st DCA 1987), quoting *Seaboard Coast Line Railroad Company v. Cox,* 338 So.2d 190 (Fla.1976) (emphasis by the court). "[I]t is essential to the application of collateral estoppel that the question common to both causes of action be actually adjudicated in the prior litigation." *Smith v. Perry,* 635 So.2d 1019, 1021 (Fla. 1st DCA 1994). Further, "[i]t is a violation of due process to collaterally estop a party who has never had an opportunity to present evidence and arguments on his claim or her claim." *United Services Automobile Association v. Selz,* 637 So.2d 320, 322 (4th DCA 1994). Thus, "any doubt as to whether a particular issue was actually litigated in the previous action or whether appellant has had its day in court must be resolved in favor of appellant...." *Id.,* 637 So.2d at 324.

The collateral estoppel question for this court continues to be whether Plaintiffs' claim of a vested right to proceed with an RM-3 development is (1) identical to an issue in the state litigation which was (2) necessary and material to that court's decision. The necessity and materiality of findings by another court is determined by examining the claim in the other court. Issues are neither necessary nor material in the abstract. Nor can the question of whether the issues are "identical" be decided in the abstract.[19] The subsidiary issue decided in the earlier suit must bear exactly the same operative relationship to the claim in that suit as it does to the pending suit for collateral estoppel to be applied in the pending suit. If the issue is not functionally identical in its relationship to both claims, then it cannot be said that the earlier court adjudicated an "identical" issue, or that the party opposing application of collateral estoppel has yet had its day in court as to the question. Doubts are to be resolved under Florida law in favor of the party against whom collateral estoppel is asserted.

Thus, the fact that Plaintiffs litigated an issue in the state court which that court said it could not decide cannot operate to create collateral estoppel in the case at bar. It is fundamental that a defendant cannot be estopped by a plaintiff's unsuccessful attempt to inject immaterial and irrelevant issues in an improper forum.

The findings of the state court concerning the interaction of Plaintiffs and Defendant in the period from 1972 through 1989, prior to the establishment of Estate zoning, could only have been material and necessary to the issue of vesting of development rights under Estate zoning, just as the state court said in its opinion. Viewed in this way, any apparent disparity and tension between the state court's findings and its ruling disappears.[20]

Nor is this result absurd, as Plaintiffs' argue. The supplemental briefing has revealed that the state court's decision was not without significant legal effect. Defendant has shown that vesting against the Comprehensive Plan relieved Plaintiffs of having to comply with the concurrency requirements of the Plan to build within Estate zoning. Prior to adoption of the Comprehensive Plan, Estate zoning, standing alone, did not regulate the issue of concurrency. The Comprehensive Plan would have. Had the Plaintiffs not

**19.** The previous order denying summary judgment noted that in the abstract the legal issue was the same in that principles of equitable estoppel under Florida law were applied in the state suit.

**20.** The opposite view is simply untenable: that the state court determined Plaintiffs' vesting rights to complete an RM-3 zoning development even though it explained that it had no jurisdiction to determine that claim.

obtained a ruling in state court that the Comprehensive Plan does not apply to the land it held in Estate zoning, it would have had to show that the capacities for potable water, sanitary sewer, solid waste, stormwater management, parks and recreational facilities, mass transit, and roads were sufficient to serve the existing population, vested development, and the proposed development.[21] It matters not, as Plaintiffs argue, that they believe that they could easily show concurrency. The point is that as a result of the state court decision, they now do not have to.

Because the claim in the state court was so different from the claim in the case at bar, the issues decided by the state court are not identical to the issues in the case at bar as intended for the operation of collateral estoppel. The reasoning of the prior order continues to be the reasoning that seems best to fit this case, especially since equity is at stake rather than an ordinary common law claim. Equity is inextricably entangled with the specific claim. It is driven by principles of fundamental fairness. Equity requires that a court balance the relative positions of the parties with respect to the particular claim. As the claim changes, so do the equities.

While it would have been relatively easy for the state court to decide equities in Plaintiffs' favor when the only question was an Estate zoning development against the new requirements of the Comprehensive Plan, it would have been quite a different question to decide the balance of equities for RM–3 vesting against the Comprehensive Plan. The equities, both with respect to the developer's representations as to what sort of development was intended and the County's protection of the public interest, change radically as the nature of the development changes from an Estate zoning development to an RM–3 development. The order granting summary

judgment in favor of Defendant should not be altered as to this question.

## V. The 1972 letter to Dr. Bennison and the Florida law equitable estoppel claim

In his September 18, 1972 letter to Dr. Bennison, Pelham wrote:

> [W]e obviously do not intend to construct any improvements in any areas that might reasonably be expected to be subjected to flooding. All permanent improvements would be located substantially above the proposed hereinafter described holding ponds.... We would not anticipate construction of any buildings at an elevation of less than 105 feet.

The order granting summary judgment found that this was a clear promise to the County not to build below the land elevation of 105 feet above sea level, but to build substantially above the holding ponds,[22] that the County relied upon these representations when it granted the rezoning to RM–3, and that equity would provide no remedy for development contrary to these promises. Plaintiffs seek rehearing as to the facts and the law underlying these findings.

All reasonable inferences from the evidence must be made in Plaintiffs' favor on summary judgment. *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988). The burden of demonstrating such genuine issue is upon Plaintiffs.[23] They must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A scintilla of evidence is insufficient. There must be such evidence presented by Plaintiffs that a jury could reasonably return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby*, 477 U.S. 242,

---

**21.** Doc. 415, Herbert W.A. Thiele aff., para. 15.

**22.** There actually appears to be only one holding pond constructed on tract 5 northward of Phase I. Pelham dep., ex. 2; Wilkes aff., ex. 9. There is a low pond site also straddling the line between tracts 2 and 3, and close to the dike. Wilkes aff., ex. 8.

**23.** When confronted with a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Finally, while the court must resolve *reasonable* doubts in favor of the non-moving party, it is not required to resolve *all* doubts in favor of the non-moving party. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

The first contention on rehearing is that the court has failed to construe all reasonable inferences in a light most favorable to Plaintiffs in finding that the Bennison letter was communicated to the County Commissioners. This finding was based entirely on inferences since there is no direct evidence from anyone who was a member of the Board in 1972, there is no evidence that any copy of the Bennison letter was maintained in any County file except the file of the Planning Commission, and there is no direct evidence that Pelham himself transmitted the Bennison letter to the Board.

The evidence concerning whether the Board of County Commissioners ever became aware of the Bennison letter is the following. There is no genuine dispute that the Bennison letter was considered by Dr. Bennison and that he relied upon it to withdraw his objections to the rezoning. This is established by Dr. Bennison's letter and Pelham's letter in reply, which seem to be exactly what they appear to be, and there is no contrary evidence.

There is also no genuine dispute that the Bennison letter was considered by the Planning Commission, as previously discussed. While Ms. Gregory stated in her affidavit only that a copy of the letter was in the Planning Commission files,[24] Pelham testified that he sent this letter to Dr. Bennison.[25] When shown that the letter recited that a copy had been sent to Frank Brannan, Pelham said that Brannan was the Director of the Leon County Planning Department and

responded "correct" when asked if the letter "was apparently also sent to members of the planning commission."[26] Since Plaintiffs present no other evidence on the subject, no reasonable inference arises that the Bennison letter was not received by, and fully considered by, the Leon County Planning Department and Planning Commission.

Plaintiffs now argue that there is a reasonable inference from the evidence that Pelham did not send a copy of his letter to Dr. Bennison to the Board of County Commissioners, and that the Board did not otherwise know of the contents of that letter when they voted to rezone to RM–3. Plaintiffs' first contention in this regard is true: the Gregory affidavit does not provide evidence on this subject. The court's citation to the Gregory affidavit for that proposition, doc. 392, at p. 31, n. 48, was incorrect.

The evidence as to whether the Board of County Commissioners had knowledge of the Bennison letter, or received a copy of it, is the following. On September 18, 1972, the Planning Commission voted to deny the rezoning request despite Plaintiff's letter to Dr. Bennison. On July 19, 1990, Pelham was deposed and shown a copy of a letter from him, as President of Equity Resources, addressed to the Board of County Commissioners.[27] It is dated September 25, 1972, seven days after the Planning Commission voted unfavorably on the rezoning request. On the last page of the letter, Pelham states:

> When the technical staff submitted to you their recommendations for our zoning application and they submitted to you a copy of a letter sent to them by the Leon County Health Department, I'm very sorry that they failed to send to you at the same time copies of the engineering report we submitted to them, and *a copy of the letter transmitted to [sic] Equity to the Health Department and a copy of the second letter sent by the Health Department to us in reply.* All of these letters and reports were on file with the technical staff and I think will give you a clearer understanding

24. Gregory aff., para. 2.c.(ii).

25. Pelham dep., 7–19–90, p. 90 and ex. 14 (the letter).

26. *Id.*, p. 91.

27. Pelham dep., 7–19–90, pp. 92–93 and D.Ex. 16.

of the proposals now before you. I am enclosing copies of the above mentioned letters and reports to give you a more in depth study as to what is being planned in the Lake Jackson area.

(Emphasis added).

Pelham at that time was a prospective developer who wished to build a costly and potentially profitable multi-family project. He was faced with an adverse recommendation from the County Planning Commission, but he had obtained a retraction of environmental objections from the County's Chief Health Officer, Dr. Bennison, after a recent exchange of letters. He was seeking politely to correct the record forwarded to the Board of County Commissioners from the Planning Commission by sending them the full Pelham–Bennison correspondence. Based on context alone, a fact-finder would not reasonably find that Pelham did not actually send this letter to the Board.

But there is more evidence. Plaintiffs contend that Pelham testified that "to his recollection [the September 25th letter] was never sent to the County Commission." Doc. 396, p. 5. That contention is not supported by the record. Pelham testified that he did not "specifically recall this letter." [28] Counsel for Defendant represented that exhibit 16 was a copy from an "onion skin copy" he had obtained from the Messer law firm [a Tallahassee law firm].[29] Exhibit 16, the September 25th letter, does not bear a signature. When counsel pointed out that in 1972 it was common to keep unsigned carbon copies and send out the original, Pelham said: "Yeah. I am not saying that this did not happen. I am saying I don't remember specifically this letter. And since it didn't have a signature I couldn't—there is no way of saying that I did sign the letter." [30] He followed this by saying that in "those days it was numerous telephone conversations, personal visits to various members of the agencies and commissioners as well as the written correspondence, and it very well could have taken place. I just don't remember with specificity." [31] Later he said he was not denying that he sent this letter to the Board of County Commissioners, that he "very well could have," but without a copy with his signature, he could not say the letter was ever sent.[32] He admitted that the letter contained his positions at that time.[33] Finally, Pelham admitted that the passage quoted above from the letter of September 25th referred to his exchange of letters with Dr. Bennison the week before.[34]

A central public objection at that time to the rezoning was the issue of preserving the quality of the waters of Lake Jackson. Dr. Bennison, then the County's chief officer for health concerns, had also objected for this very reason. It is without dispute that Pelham wrote the letter to Bennison, an important agent of the County, to allay his concerns. Despite Pelham's September 18th letter and Dr. Bennison's retraction of his objections, the Planning Commission recommended that rezoning be denied. Consequently, it would be entirely unreasonable to conclude on this evidence that Pelham did not in fact send his September 25th letter to the Board of County Commissioners to convey to them his promises as contained in the September 18th letter to Dr. Bennison and Dr. Bennison's acceptance of those promises and retraction of his objections.

Plaintiffs also now contend that even if transmitted to the County Commissioners, Pelham's representations to Dr. Bennison concerning elevation referred to the elevation of the first floor of the buildings above sea level, not the foundations.[35] The sentence in question is: *"We would not anticipate construction of any buildings at an elevation of less than 105 feet."*

---

28. Pelham dep., 7–19–90, p. 92.

29. *Id.*, p. 93.

30. Pelham dep., 7–19–90, p. 93.

31. *Id.*

32. *Id.*, p. 95.

33. *Id.*

34. *Id.*, pp. 101–102.

35. Pelham testified that 105 feet meant a datum from sea level. Thus, the issue is whether the "elevation" intended was the foundation of the building or the first floor.

The sentence at issue means only one thing in English, the meaning ascribed to it in the last order. The preposition "at" in the sentence begins a prepositional phrase modifying the noun "buildings." The first definition of the word "at" provided by **Webster's Third New International Dictionary** (1986), is where "used as a function word to indict presence in, on, or near." [36] This is how the court construed the sentence. In the last order it was thought that the only meaning of the sentence was that the buildings themselves were to be *at* (that is, located upon the ground) a point above 105 feet sea level.

Another meaning of "at" provided by the same dictionary is when "used as a function word to indicate (1) rate, degree, or position in a scale or series." Essentially the same meaning of the sentence is reached when this definition is used. The intended scale, as Pelham testified, is in feet from sea level, and the intent is to place the noun, buildings, in the position it would occupy on that scale. A building, tree, person, or any other object, would be "at 10 feet above sea level" if the base of the object, where it touches the ground, is 10 feet above sea level.

The same dictionary defines "elevation" as both "the height to which something is elevated" and "the height above sea level: altitude." The "something" which was to be elevated, as stated in the sentence, was a building, not the floor of a building.

The only definition in the same dictionary for "elevation" which specifically refers to a building, and has reference to construction plans, is "a geometrical projection (as of a building) on a plane perpendicular to the horizon: orthographic [characterized by perpendicular lines or right angles] projection on a vertical plane." Thus, an "elevation" on construction plans is the side view showing the structure, or a portion thereof, projected against the horizon. The word has no meaning with respect to the location of the first floor of a building in relationship to sea level.

Further, this sentence must be read in conjunction with other sentences in the same letter. The letter was sent to Dr. Bennison to reassure him as to the impact of the buildings upon the quality of the waters of Lake Jackson. Earlier in the letter Pelham had sought to reassure Dr. Bennison by saying: "[W]e obviously do not intend to construct any improvements in any areas that might reasonably be expected to be subjected to flooding. All permanent improvements would be located *substantially above* the proposed hereinafter described holding ponds." (Emphasis added.) Here, Pelham was clearly referring to the location of the buildings (the "permanent improvements") upon the land, not to the location of floors of buildings. Additionally, the representation in the letter that the "permanent improvements" would be "substantially above" the holding ponds fits perfectly with a reading of the sentence in question that the court has previously found, that the buildings themselves would be located above 105 feet sea level.

If the Bennison letter had been intended to represent only that the first floor of the buildings would be above 105 feet above sea level, the sentence would have referred to "the first floor of the buildings" rather than to just the "buildings." Further, given the fact that Dr. Bennison had objected to the proximity of the development to the lake, it is not reasonable to read the letter as having any reference to the elevation of the floor of the buildings. A representation that the floor levels would be kept above 105 feet sea level would have done little to assuage Dr. Bennison's concerns since that might have been achieved by constructing buildings on pilings in or nearly in the water. Dr. Bennison's concern was simple: Where are the buildings going to be in relationship to the waters of Lake Jackson? The letter answered that question.

Plaintiffs also argue that the court erred in the manner in which it read this sentence by failing to note that the Bennison letter represented that 1,395 units were to be built in the RM–3 zoning areas. Doc. 396, p. 8. It is argued from this that it would have been absurd to construe the statement concerning the 105 foot elevation as referring to a point on the ground since not enough land would

36. "Basically, *at* is the preposition of general (usually static) location, answering the question 'Where?'" **Webster's New World College Dictionary**, p. 92.

have been available for that many units had that been intended. Plaintiffs note that the court has found undisputed that of the approximately 13 acres in tracts 2 and 3 under scrutiny now, less than one-half acre is above the 105 foot elevation. They argue that the same is true with respect to all of the property rezoned to RM–3 in 1972. Referenced for that proposition is the deposition of Pelham on January 27, 1994, page 9 and exhibit 2.

With regard to the representation concerning 1,395 units, that number appears in the September 25, 1972, letter to the Board of County Commissioners,[37] not the September 18th letter to Dr. Bennison. Indeed, Plaintiffs' reliance upon the representations made in the September 25th letter to the Board of County Commissioners, seems to admit that there is no genuine issue of fact that this letter was sent to the Board as found above.

The 105 foot elevation representation in the Bennison letter is made in context with the plan to build high rise apartments on a minimum portion of land. The pertinent paragraph from the Bennison letter is:

We would not anticipate construction of any buildings at an elevation of less than 105 feet. We are asking for rezoning to RM–3 zoning classification. This is the only medium or high density residential zoning classification which has no height restrictions. With an unlimited height restriction, we, or course, can achieve the desired number of residential units with a minimum of land usage thereby substantially increasing the undisturbed green areas located within this portin [sic] of the development. In other words, instead of having a spread of our development whereby we would have a multitude of building units and a multitude of separate driveways and streets, we would build vertically. We also plan to have deck parking for a substantial portion of the required parking facilities. This, of course, would substantially reduce the amount of required paving which in turn would reduce the amount of runoff. Runoff from outdoor parking areas would be collected in storm drains which would carry water from such areas to the holding ponds. Also, the wa-

ter from the roof area of the high-rise building would be collected into roof drains which would carry the water direct to the holding ponds. Any necessary roadways would primarily run paraellel [sic] to the contour of the lands in order to give a terracing effect and this [sic] help control the flow of water. We feel that the collection of water in accordance with the foregoing plan and the routing of the same into the holding ponds will result in the ater [water] ultimately reaching Lake Jackson in a purer state than water which would be dischrged [sic] from the lands if they were never improved. Certainly the quality of the water would be substantially higher than that which would flow off from any farming operation or single family development of 50 or 60 houses.

In his September 25, 1972, letter, Pelham first discussed the Equity Resources application for rezoning. He said that the TCC report reflected that RM–3 zoning would permit 1,775 units, but he arrived at a maximum density of 1,155 units. He then said that it was rare for any property zoned multi-family ever to be developed to its maximum density, and said that if "Equity Resources should develop this property to its maximum allowable density it would be some 40% less than the calculations indicated in the TCC report." A 40% reduction of 1,775 units would be 1,046 units. In the same letter, Plaintiff mentioned the Faulk application for rezoning. There he said: "If we should develop this property to the maximum allowable density (which is very unlikely) the maximum number of units would be 1,395, considerably less than the 3,290 as indicated in the TCC report."

Thus, the September 25, 1972, letter to the Board set forth an intention to build an approximate maximum of 2,441 units (1,046 plus 1,395), but expressed the view that development of even this many units was highly unlikely. When read with the September 18th Bennison letter, Pelham's clear intent was to build the multi-family apartment units on a small portion of the land zoned RM–3, to build above the 105 elevation line (or at

37. Pelham dep., 7–19–90, ex. 16.

least substantially above the holding ponds), and to build high-rise apartments of something less than 2,441 units.

With regard to the issue of whether there was enough useable land above the 105 foot elevation line and within the land rezoned to RM–3, Defendant argues that the RM–3 rezoned land contained substantially more than the one-half acre in tracts 2 and 3 which is above the 105 foot line. This is true. Ordinance 72–100 rezoned to RM–3 two tracts of land, one containing about 17.16 acres, and the other containing about 31.98 acres, a total of about 49 acres.[38] As discussed in the last order, tracts 2, 3, and 5, are located within the 17.16 acre and 31.98 acre tracts.

Exhibit 4 to the affidavit of Broward Wilkes superimposes the 49 acres rezoned to RM–3 (the parcels bought by Plaintiffs from the Faulkes) onto sketches of tracts 2, 3 (at issue in this case) and 5 (where Villas Phase I is constructed). Exhibit 4 shows that southward of tracts 2, 3, and 5 is a strip of land still within the 49 acres rezoned to RM–3 which visually appears to be about 10 or 15% of the total 49 acres, or from 5 to 8 acres. While the actual acreage of the portions southward of tracts 2, 3, and 5 in the RM–3 zoning area is not in evidence, Defendant has carried its burden on summary judgment of pointing to evidence consistent with its theory that there was adequate land within that rezoned RM–3, but below tracts 2 and 3, to fulfill Plaintiffs' plan of building high-rise apartments, assuming it was above the 105 foot contour line or, if not, at least substantially above the holding ponds.

The remaining issue is whether it is undisputed that this land, or a substantial portion of it, is above the 105 foot line, or at least substantially above the holding ponds. Exhibit 8 to the affidavit of Broward Wilkes is represented by Wilkes to show the "topographic elevations and contours for Tracts 2

& 3...."[39] The elevations increase to the southward of tracts 2, 3 and 5.[40] The contour lines, however, stop at the southward borders of tracts 2, 3, and 5. In the southwest corner of tract 2, there is a rather obvious hill and the contour line rapidly reaches 110 feet. This exhibit is compared to an exhibit relied upon by Plaintiffs as depicting accurate contour lines, exhibit 2 to the January 27, 1994, deposition of Pelham (doc. 396, pp. 9–10).[41] The contour line marked 94.712 feet above sea level is clearly shown on exhibit 8 to the Wilkes affidavit. It leaves tract 2 headed in an east by southeast direction. Exhibit 2 to the Pelham deposition depicts contour lines at about the same spot on tract 2 heading to the east by southeast, then turning easterly through the middle of Clara Kee Boulevard and turning northeast through tract 5. There is no other evidence from Plaintiffs. Thus, it is undisputed that most of the land southward of tracts 2 and 3, but still within the 49 acres rezoned RM–3, is above the 105 contour line or, if not, is substantially above the holding ponds.

Thus, the land southward of tracts 2, 3, and 5, but still within the RM–3 rezoning parcels, appears to have been sufficient to build high-rise apartments above the 105 foot contour line and substantially above the holding ponds, but still of the approximate density described in Pelham's September 25, 1972, letter to the Commission. Such a development might have caused the relocation of the primary roadways into parcels zoned for lower densities, but that would not have made the development as described in the two letters inconsistent with the 105 foot line representation in the first letter.

Moreover, even if the density necessarily would have been diminished by the promise to build above the 105 elevation line, that

38. Wilkes aff., para. 8, exs. 3 and 4.

39. Wilkes aff., para. 8.

40. The land above the 105 foot contour line is shown as in the southwestern corner of tract 2 on exhibit 8, which is about .43 acres, as discussed in the previous order.

41. Defendant correctly notes that exhibit 2 has not been established to be a verified survey.

Indeed, it does not even have numbers on the contour lines. Nonetheless, Plaintiffs themselves have argued that it is accurate, and the lines shown are sufficient for the court to infer the direction of the 105 foot line. If the inferences drawn by the court are unreasonable, on summary judgment it is Plaintiffs' burden to come forward with better evidence.

result is not so unreasonable as to give rise to any reasonable inference that the promise was only a sleight of the hand, one that Pelham had no intention of fulfilling. By this representation Plaintiffs obtained not only the RM–3 rezoning, but also rezoning to RM–2 and to Commercial 2 of a large number of acres of one of the Faulk parcels.[42] The RM–2 and Commercial portions have been substantially built out by Plaintiffs.[43] Indeed, looking at the 125 acres acquired by Bent Tree, Ltd., from the Faulks on October 16, 1972 (which includes tract 2) and the 40 acres acquired by Pelham and Pennington in 1972 from the Faulks (which includes tract 3), almost all of the land rezoned has now been developed by Plaintiffs.[44]

Plaintiffs also contend that the word "anticipate" in the sentence concerning the 105 foot elevation line qualifies the representation and renders incorrect the court's finding that this was an unequivocal promise. The phrase "would not anticipate" is in the subjunctive mood. The subjunctive mood expresses a possible or contingent feeling about an action.[45] But the subjunctive mood is also commonly used these days to declare intention in a more formal way, particularly when addressing a public body or authority. But more important, the possible contingency latent in the sentence[46] is modified by the preceding sentence, which stated: "All permanent improvements would be located substantially above the proposed hereinafter described holding ponds." While this sentence technically is also in the subjective mood,[47] the only possible contingency at issue was approval of the project. There was no further "anticipation" contemplated or mentioned. The sentence unequivocally conveys a promise that if the project is approved by the County, permanent improvements *will* be above the holding ponds. Taken together, therefore, and construing the words in a manner such that all reasonable inferences are in Plaintiffs' favor, it is held that in 1972, to obtain the change to RM–3 zoning, Pelham represented to Dr. Bennison, to the Planning Commission, and to the Board of County Commissioners, that he anticipated that the buildings of his planned development would be located on the ground above 105 feet above sea level, but that if located below that line, which he did not anticipate, would be "substantially above" the holding ponds and would be high-rise buildings using less of the land rezoned. The previous order is modified accordingly.

■■■ Were the foregoing all that should be reconsidered, the court would adhere to its prior order granting summary judgment for Defendant. But this analysis has caused the court to discover an error in the prior order concerning application of the elements of equitable estoppel. To restate, the elements of "equitable estoppel" are:

(1) a property owner's good faith reliance

(2) on some act or omission of the government and

(3) a substantial change in position or the incurring of excessive obligations and expenses so that it would be highly inequitable and unjust to destroy the right he acquired.

As so defined, *Plaintiffs'* reliance upon the "act or omission" of the County, and the good faith of that reliance, are two important ele-

**42.** O'Neal aff. (4–27–94), BCC Book 33, p. 452 and Ordinance 72–100. The rezoning to Commercial 2 is not mentioned in the minutes, but is contained in the Ordinance.

**43.** Wilkes aff., ex. 9.

**44.** Wilkes aff., exs. 1, 2, 3, 4, 5, 6, and 7 compared to the built out sketch, ex. 9.

**45.** **Webster's Third** defines "subjunctive" as "of, relating to, or constitution a verb form or set of verb forms that represents an attitude toward or concern with a denoted act or state not as fact but as something entertained in thought as contingent or possible or viewed emotionally...."

**46.** The contingency is double. The verb "would" sets up the subjunctive mood. If this were all, as discussed ahead, since the only conceivable contingency was approval by the County, the use of the subjunctive mood would not have caused equivocation as to whether a promise concerning the 105 foot line had been intended. But a second contingency is created by the word "anticipate," which implies that the developer's thought process was not final.

**47.** It would have been a declaration of future fact if "will" had been the verb used.

ments which Plaintiffs must prove. Plaintiffs need not, strictly speaking, prove that the County acted in reliance upon Plaintiffs' acts or omissions. However, the importance which the County placed upon the promises made by Pelham in the Bennison letter, as evidenced by the County's subsequent conduct, is relevant to all three elements of equitable estoppel: the "good faith" of Plaintiffs in reliance, the "acts or omissions" of the County, and the weighing of the equities (the "highly inequitable" issue). If the promises made by Pelham in 1972 were of no importance to the County over the many years that Plaintiffs have been developing the property, and if the County acted accordingly, then it cannot be said that those promises are necessarily dispositive of the question of Plaintiffs' "good faith" and the equities between the parties.

▉▉▉ The prior order found that it was undisputed that in 1972 when Defendant granted the petition to rezone to RM–3, it was aware that Pelham, through affiliated business organizations, had an ownership in the property rezoned and intended to develop it. Doc. 392, p. 28. Pelham wrote the letter to Dr. Bennison on September 18, 1972, four days after the Planning Commission had voted to defer a recommendation on the rezoning petition until September 18, 1972, due to citizen concern that a multi-family development would pollute the lake. *Id.*, p. 29. However, although Dr. Bennison withdrew his objections to the development, the Planning Commission recommended denial of the petition to rezone. *Id.*, p. 32.

A month later, on October 17, 1972, the Leon County Commission voted to rezone, rejecting the Planning Commission's recommendation. Doc. 392, p. 32. The minutes and the Ordinance changing the zoning to RM–3 omitted any reference to Pelham's promise in his letter to Dr. Bennison to build above the 105 foot contour line and substantially above the holding ponds, and, in particular, did not make this a condition of the zoning or of the future granting of development permits. *Id.* As discussed above, there is no other reasonable inference from the evidence but that the County Commissioners *knew* of Pelham's promises to Dr.

Bennison when they voted, yet they did not explicitly condition the rezoning upon fulfillment of the promises.

There is also evidence from which a jury could conclude that Pelham built a stormwater system as he had promised in 1972 to service the multi-family development on the land now in dispute. Doc. 392, pp. 33–34. There is also evidence from which a jury could conclude that the County was aware that Pelham's development occurred over the years in phases, and that development activity was continuous from 1972 to 1989, when rezoning to Estate occurred, and that the County granted building permits continuously during this period. *Id.* There is also evidence from which a jury could conclude that Pelham relied upon the fact that the property was zoned RM–3 as he and his affiliated companies expended money on the development, and that those expenditures included design and dedication of roads, construction of sewer facilities sufficient to service the entire development, and approval of an electrical utility franchise to service the entire development. *Id.*, p. 34.

The court has also previously discussed the evidence surrounding the 1981–1982 negotiations between representatives of the County and Pelham's representative concerning purchase of the disputed property by some governmental entity. Doc. 392, pp. 36–41. Former Chairman of the Leon County Commission Crews averred that Plaintiffs could have applied for building permits during this period but refrained from doing so in reliance upon his promise that the Commission would not pass any new land use regulations unless those contained "grandfathering" provisions "that would permit development of the Lake Jackson property in a manner consistent with their development plans." *Id.*, p. 36. He also averred that he knew that Plaintiffs were entitled to apply for building permits for multi-family construction during that period. *Id.*, p. 37. Finally, former Commissioner Crews averred that he told Plaintiffs during this period that he thought their rights to develop were vested because the County knew that Plaintiffs had expended considerable sums of money to develop the property to permit multi-family housing. *Id.*

Similar but more general averments are contained in the affidavit of former County Commissioner Vause.

Former Commissioners Crews and Vause made no mention of any promise by Pelham to build multi-family housing only above the 105 foot contour line in this affidavit. Nor do the minutes of the County Commission during this period (at which the land purchase or swap was discussed) mention the promises made by Pelham in his September 18, 1972, letter to Dr. Bennison. *Id.*, pp. 39–40.

At some time before the rezoning took place in 1989, Plaintiffs constructed Villas Phase I. That the buildings of Phase I were built below the 105 foot line is undisputed. Exhibit 9 to the Wilkes affidavit shows all the structures in place in May–June 1991.[48] Villas of Lake Jackson, Phase I, is shown on exhibit 9 as constructed on tract 5 and the eastern portion of tract 3.[49] The contour lines for tract 3 stop where the parking lot and buildings of Phase I begin.[50] Nonetheless, as was explained above, by looking at exhibit 2 to Pelham's deposition of January 27, 1994, the 105 foot contour line runs easterly down Clara Kee Boulevard directly south of tract 3 and then turns to the northeast into tract 5. Most of the buildings depicted on exhibit 2, which are the multi-family buildings of Phase I, are located below the 105 foot contour line. Both exhibit 9 from the Wilkes affidavit and exhibit 2 from that Pelham deposition show that the buildings and permanent improvements (parking lots) of Phase I surround the holding pond on the south and west, and are not substantially upland from it. Thus, the County did not limit the development of Phase I to the promises Pelham made in his 1972 letter to Dr. Bennison.

On February 23, 1988, the Commission was formally reminded of the Bennison letter since that letter was submitted in an open meeting by a citizen, George Lewis, in opposition to Plaintiffs' plans to construct the multi-family development at issue in this case. Doc. 392, pp. 44–45. Before the Commission that day was the question of whether

to approve the Talquin Electric application to expand sewer service to, among other areas, the land at issue in this case. The Commission approved the application. Commissioners Vause and Nelson stated that they believed Plaintiffs had vested rights to develop the property. *Id.*, p. 45. There is nothing in that record which shows that the Commission believed that Plaintiffs were bound by the 1972 letter to Dr. Bennison.

On June 20, 1989, George Lewis again submitted the Bennison letter to the Commission in an open, public meeting. *Id.*, p. 48. The issue of rezoning the land to something other than RM–3 was then under consideration by the Commission.

On October 3, 1989, the County issued conditional permits for stormwater and landscaping improvements on the land at issue in this case, both in furtherance of the planned multi-family development. *Id.*, p. 49. As previously discussed, the County had already initiated consideration of rezoning to Estate and the permits stated that they were conditional upon the zoning remaining the same. *Id.*, pp. 49–50. But the permits made no mention of the development limitations Pelham had promised in the 1972 letter to Dr. Bennison.

In summary, the 1972 rezoning decision could have been made conditional, limiting multi-family development to the land above the 105 foot contour line. It was not. In the 1981–1982 period, when discussing the "vested rights" question, and as they obtained delay in Plaintiffs development in an effort to buy the property, the County Commissioners could have reminded Plaintiffs of their promise to build only above the 105 foot contour line, but they did not. Later, when Phase I was permitted, the County could have enforced the promise to build only above the 105 foot line, but it did not, and a substantial multi-family development was placed below the line. Finally, by 1989 the County had twice been reminded by George Lewis that Plaintiffs had promised in 1972 not to build below the 105 foot line, but it permitted

48. *Id.*, para. 9.

49. Pelham dep., 1–27–94, p. 14 and ex. 2.

50. *Id.*, exs. 8 and 9.

start-up work for Villas Phase II without conditioning the permit upon that limitation.

The remaining elements of a factual issue of equitable estoppel, while not discussed in the prior order, are present here. Plaintiffs have come forward with enough evidence as to the nature and extent of their reliance upon the RM–3 zoning to create a genuine dispute of material fact concerning element 3 above.

One reasonable inference from all of this evidence is that Plaintiffs have not failed to act in good faith with the County. It is not the only reasonable inference, but that is irrelevant to a motion for summary judgment. That it is a reasonable and permissible inference defeats summary judgment as to the existence of a due process property interest. Accordingly, Plaintiffs' motion for rehearing is granted to this extent. Defendant's motion for summary judgment as to these questions will be denied.

## VI. Summary

Part I.A. of the order which granted summary judgment, doc. 392, pp. 4–15, has been reconsidered. However, the court finds no basis to disturb the ruling previously entered as to the collateral estoppel effect of the state court decision upon Plaintiffs' claim of a property right to develop an RM–3 development.

In part I.B. of the order which granted summary judgment, the court granted Defendant's motion for summary judgment as to the standing of Villas of Lake Jackson, Ltd., but denied it as to the other Plaintiffs. Doc. 392, pp. 15–27. There is no basis to alter that ruling.

In part II.A. and B. of the order which granted summary judgment in favor of Defendant, the court found no genuine dispute of material fact as to whether Plaintiffs had a property right under state law to proceed with an RM–3 development, and concluded as a matter of law that a state created property right has not been shown to exist for due process purposes. That conclusion was wrong as discussed above. There are genuine disputes of material fact as to whether a due process property right exists. Defen-

dant is not entitled to summary judgment on this basis, and the order granting summary judgment is modified accordingly. Nonetheless, it is now the court's conclusion that it lacks subject matter jurisdiction of the entirety of Count III, and that a due process takings claim does not exist, particular to the extent that it is aimed only at the refusal to permit an RM–3 development. The substantive due process claim presented in Count II fails for the alternative reasons expressed in part V of the prior order.

 The court's finding that there is a dispute of material fact as to whether Plaintiff's had a due process property right under state law to proceed with RM–3 development affects an issue previously left pending. In part III of the order which granted summary judgment in favor of Defendant, the court declined to rule on the impact of *McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994) (*en banc*) upon Plaintiffs' due process claims in Counts II and III. Doc. 392, pp. 70–73. The court now finds that the 1989 rezoning was compelled by policy considerations arising from the more general 1988 ordinances applicable to all of the land surrounding Lake Jackson and therefore was a legislative act. *See* footnote 3, *supra*. Because the governmental action involved in this case was legislative, the distinction between available remedies discussed in *McKinney* is not germane to Count II or III. Further, the court now finds that because the rezoning was a legislative act, *McKinney* does not vitiate the Plaintiff's substantive due process claim. Defendant's arguments to the contrary are rejected.

In part IV of the prior order, summary judgment was granted as to Count IV, the equal protection claim. Rehearing has not been sought as to this ruling, and it should stand. *Haves v. City of Miami*, 52 F.3d 918 (11th Cir.1995) provides additional support for the court's analysis as to this question.

In part V of the court's opinion, the court discussed Defendant's alternative ground for summary judgment as to Count II, the arbitrary and capricious due process claim. Doc. 392, pp. 88–90. Now that the first basis for summary judgment as to Count II (lack of a genuine dispute of material fact that there

was a state created property interest) has been rejected, the reasoning of that order becomes operative. Summary judgment in favor of Defendant will still be granted as to Count II for the alternative reason. Additionally, the court relies upon *TRM, Inc. v. United States*, 52 F.3d 941, 945 (11th Cir. 1995) and *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214, n. 6 (11th Cir.1995), which reaffirmed that the due process "rational basis" test is the same as the one used for an equal protection claim.

In so ruling, the court has considered that there is a genuine dispute of fact as to whether Plaintiffs can show the existence of a property interest in proceeding with the RM–3 development protected by state law. The existence of *that* dispute of fact, however, is found to have no bearing upon whether there is any genuine dispute of fact that the County acted upon a conceivable rational basis in changing the zoning to Estate in 1989. Despite the reasonable inferences drawn in Plaintiffs' favor in the property right analysis, there remains no genuine dispute of material fact as to whether the County had a rational basis for rezoning the property to Estate in 1989.

In part VI of this court's earlier opinion, the court alternatively applied the analysis of the first *Reahard* decision to determine that Defendant should be granted summary judgment as to Count III, the due process takings claim as it was aimed at the taking of the right to obtain permits to build the RM–3 development. Doc. 392, pp. 90–91. A takings claim requires consideration of the history of how the land was zoned, the present nature and extent of the property, and the "reasonable expectations of the landowner under state common law." *Reahard v. Lee County*, 968 F.2d 1131 at 1136 (11th Cir. 1992). The underpinning of the court's former analysis was that there was no genuine dispute of material fact that Plaintiffs had no reasonable expectations of development below the 105 foot contour line, or to build to the edge of the holding ponds. That finding has been modified as explained above. As to Plaintiffs' expectations and the reasonableness thereof there is a genuine dispute of material fact. Part VI of the court's opinion,

doc. 392, pp. 90–91, is modified accordingly. But this ruling does not alter the court's conclusion that it lacks subject matter jurisdiction of the entirety of Count III, and that a due process takings claim does not exist, particularly to the extent that it is premised only upon the refusal to permit an RM–3 development.

Accordingly it is ORDERED that Plaintiff's motion for reconsideration, doc. 395, is GRANTED in part, and the order granting Defendant's motion for summary judgment, doc. 392, is MODIFIED as discussed in this order. Counts I, III, and V of the Fifth Amended complaint are DISMISSED as discussed herein and in previous orders. Defendant's motion for summary judgment is GRANTED as to Counts II and IV. In light of these rulings, the Clerk is DIRECTED to enter judgment in favor of Defendant.

DONE AND ORDERED.